UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FREEDOM WIRELESS, INC.,

Plaintiff,

v.

BOSTON COMMUNICATIONS GROUP,
INC.; ET AL.,

Defendants.

CIVIL ACTION No. 00-CV-12234-EFH

## BOSTON COMMUNICATIONS' MOTION FOR JUDGMENT AS A MATTER OF LAW THAT BOSTON COMMUNICATIONS ALONE DOES NOT DIRECTLY INFRINGE FREEDOM'S PATENTS

Freedom's theory of direct infringement liability throughout this trial has been that

Boston Communications and the carrier defendants together directly infringe the asserted claims

under a so-called "joint infringement" theory. That theory cannot prevail, and defendants have

filed a separate motion seeking judgment as a matter of law as to so-called "joint infringement."

Because Freedom has based its case on so-called "joint infringement," Boston

Communications with *this* motion seeks judgment as a matter of law that it does not directly

infringe by its own conduct alone. There is no evidence that Boston Communication itself

performs every step of any asserted claim, and hence the Court should find that as a matter of

law Boston Communications, standing alone, does not infringe any of the asserted claims of

Freedom's patents.

## I.     The Relevant Standard

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides:

> If during a trial by jury a party has been fully heard on an issue and
> there is no logically sufficient evidentiary basis for a reasonable
> jury to find for that party on that issue, the court may determine the
> issue against that party and may grant a motion for judgment as a

> matter of law against that party with respect to a claim or defense
> that cannot under the controlling law be maintained or defeated
> without a favorable finding on that issue.

Judgment as a matter of law is appropriate when the evidence, considered in light most

favorable to the nonmovant Freedom, "would permit a reasonable jury to reach only one

conclusion as to that issue." *Marcano-Rivera v. Pueblo Intern. Inc.,* 232 F.3d 245, 251 (1st Cir.

2000) (internal quotation marks omitted). Because Freedom bears the burden of proving

infringement, Freedom "must have presented more than a mere scintilla of evidence in its favor

to withstand judgment as a matter of law." *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 50 (1st Cir.

2003) (internal quotation marks omitted).

## II.    Argument

### A.    No reasonable jury could find that Boston Communications' conduct, standing alone, directly infringes Freedom's patents.

Freedom has tried this case on the theory of "joint infringement" by the carrier

defendants and Boston Communications acting together. Therefore, there is no evidence that

Boston Communications, by itself, directly infringes Freedom's patents, and judgment should be

entered as a matter of law in favor of Boston Communications.

Freedom has alleged that Boston Communications and the carrier defendants directly

infringe Freedom's patents under a so-called "joint infringement" theory of liability. In

particular, Freedom has claimed that Boston Communications performs certain steps of the

asserted claims (for instance, "validating an account balance") and that the separate carrier

defendants perform other steps (for instance, recognizing prepaid subscribers at a wireless

switch). Freedom has not presented any evidence that Boston Communications alone infringes

any asserted claim.

Beyond the fact that Freedom tried this case on the theory of "joint infringement," there is a further reason why Boston Communications is entitled to judgment as a matter of law that it does not directly infringe through its own acts alone. Every claim asserted by Freedom requires a wireless switch or a cellular switch and there is no evidence that Boston Communications' service bureau has such a switch or that Boston Communications itself has used a wireless switch or a cellular switch.

**III.   Conclusion**

For the foregoing reasons, the Court should grant Boston Communications' motion for judgment as a matter of law that Boston Communications alone does not directly infringe Freedom's patents.

May 9, 2005

Respectfully submitted,

DEFENDANT BOSTON COMMUNICATIONS INC.,
By its attorneys,

Michael B. Keating (BBO # 263360)
Philip C. Swain (BBO # 544632)
Vickie L. Henry (BBO # 632367)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02110
(617) 832-1000

- 3 -

## Certificate of Service

I certify that I have caused the attached document to be served by hand on Paul Ware of Goodwin Procter LLP, counsel for plaintiff, by facsimile and by Federal Express on A. William Urquhart of Quinn Emanuel Urquhart Oliver & Hedges, LLP, counsel for plaintiff, and by email on counsel for all other parties, on May 9, 2005.

Jeremy A. Younkin

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FREEDOM WIRELESS, INC.,

Plaintiff,

v.

CIVIL ACTION No. 00-CV-12234-EFH

BOSTON COMMUNICATIONS GROUP,
INC.; ET AL.,

Defendants.

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
## WITH RESPECT TO DAMAGES

Freedom has failed to present any evidence that could support a jury's finding that the

royalty it has requested, based on a rate of 5 cents per minute ($260 million total), would be

reasonable. Therefore, the Court should rule that Freedom is not entitled to such a royalty rate as

a matter of law.[1]

Instead, the highest possible amount that the jury could properly award based on the

relevant evidence is Boston Communications' profits from the allegedly infringing prepaid

wireless service bureau: $24 million in total, or 0.46 cents per minute. Accordingly, defendants

also are entitled to judgment as a matter of law that the total damages may not exceed $24

million.

## I.    The Relevant Standard

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides:

---

[1] Defendants also renew their objections to Freedom's evidence and expert testimony raised in (1) Defendants'
Daubert Motion To Preclude Testimony Of Plaintiff's Expert Witness Richard Harris Concerning The Profitability
Of The Wireless Carrier Defendants' Prepaid Businesses, filed February 22, 2005; (2) Defendants' Daubert Motion
To Exclude Testimony Of Plaintiff's Expert Witness Russell Parr At Trial, filed February 22, 2005; and (3)
Defendants' Motion In Limine To Preclude Evidence Or Reference Before The Jury To Unconsummated License
Negotiations Or Licenses In Which There Is No Documentation That Royalties Were Ever Paid Or Received For
The Patented Invention, filed February 28, 2005.

> If during a trial by jury a party has been fully heard on an issue and
> there is no logically sufficient evidentiary basis for a reasonable
> jury to find for that party on that issue, the court may determine the
> issue against that party and may grant a motion for judgment a
> matter of law against that party with respect to a claim or defense
> that cannot under the controlling law be maintained or defeated
> without a favorable finding on that issue.

Judgment as a matter of law is appropriate when the evidence, considered in light most favorable

to the nonmovant Freedom, "would permit a reasonable jury to reach only one conclusion as to

that issue." *Marcano-Rivera v. Pueblo Intern. Inc.*, 232 F.3d 245, 251 (1ˢᵗ Cir. 2000) (internal

quotation marks omitted). Because Freedom bears the burden of proving that 5 cents per minute

($260 million) is a reasonable royalty, Freedom "must have presented more than a mere scintilla

of evidence in its favor to withstand judgment as a matter of law." *Guilloty Perez v. Pierluisi*,

339 F.3d 43, 50 (1ˢᵗ Cir. 2003) (internal quotation marks omitted). Indeed, Federal Circuit

precedent requires that any hypothetical negotiation analysis be based on "sound economic and

factual predicates." *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir.

2002).

## II.    Argument

### A.    NO REASONABLE JURY COULD FIND THAT 5 CENTS PER MINUTE WOULD BE A REASONABLE ROYALTY FROM DEFENDANTS' INFRINGEMENT OF FREEDOM'S PATENTS.

Freedom presented no evidence that 5 cents a minute ($260 million) would be a

reasonable royalty in this case. *See Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1353 (Fed. Cir.

2001) ("Upon finding of infringement, [35 U.S.C. § 284] permits an award of damages adequate

to compensate the patentee for infringement, but in no event less than a reasonable royalty.").

Instead, the evidence presented at trial suggests that Freedom's claimed royalty is excessive and

contrary to economic and factual predicates.

First, Freedom's damages experts considered information after the date of the hypothetical negotiation improperly. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) ("The district court correctly understood that '[t]he hypothetical negotiation [required in a reasonable royalty analysis] requires the court to envision the terms of a licensing agreement reached between the patentee and the infringer *at the time infringement began.*'") (emphasis added); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983) ("The key element in setting a reasonable royalty. . . is the necessity for return to the date when the infringement began."). Russell Parr assumed that the parties to the hypothetical negotiation in February 1998 would have had perfect knowledge of economic circumstances through the end of 2004, and would have applied that knowledge to their analysis of the reasonable royalty. *See* Trial Testimony of Russell Parr, March 29, 2005, at 94:6 - 95:12. Richard Harris also applied post-2000 data to a Morgan Stanley profitability model from 2001 and 2003 in formulating his opinion that the wireless carriers would have expected a prepaid profit margin of 19.68% at the time of the hypothetical negotiation. *See* Trial testimony of Richard Harris, March 22, 2005, 88:12-120:16. These approaches were particularly inappropriate as applied to Western Wireless, which ceased its allegedly infringing activity in 1999, and AT&T Wireless and CMT Partners, which ceased its allegedly infringing activities in 2001. *See* Defendants' motion to strike, March 30, 2005, at 135:22 - 136:17.

Second, Mr. Parr improperly relied on the following licenses and license negotiations:

- License agreements between Cellexis (the prior owner of the patents-in-suit) and Prepaid Cellular, Inc. ("PPC") dated two years before the '067 patent issued. *See Promega Corp. v. Lifecodes Corp.*, 53 USPQ2d. 1463,1473 (D. Utah October 27, 1999) ("The agreement offers little guidance primarily because it was negotiated before the patent issued and before the parties knew what commercial success, if any, White Probes would enjoy."). The licenses granted PPC a license to prepaid

technology, equipment, know-how, and other items, as opposed to the bare patent
license that would be called for in the hypothetical negotiation.[2]

- License agreement between Cellexis and Williamsen & Hillwertz, dated two
  years before the '067 patent issued. *See id.* One of the principals of Williamsen
  & Hillwertz was a shareholder of Cellexis. The patented system was never
  deployed by this licensee.[3]

- Draft license negotiations between Freedom and SmarTalk. These negotiations
  were never consummated in an executed license. Moreover, these negotiations
  contemplated an exclusive license, as opposed to the non-exclusive license that
  would be called for in the hypothetical negotiation.[4]

There is no evidence that any of the licenses or license negotiations upon which Freedom

relies resulted in royalties actually being received for licensing the patents-in-suit, which is what

controlling case law requires. *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.

Supp. 1116, 1120 (S.D.N.Y.), *modified and affirmed,* 446 F.2d 295, 302 (2d Cir. 1971) ("The

*royalties received* by the patentee for the licensing of the patent in suit, proving or tending to

prove an established royalty.") (emphasis added). Accordingly, they are not relevant to the

hypothetical negotiation and should not be considered in any analysis of the reasonable royalty.

Third, Mr. Parr assumed that defendants could absorb the royalty or raise their prices by

5 cents per minute without considering the impact of economic substitutes on the prepaid market.

*See* Trial testimony of Russell Parr, March 30, 2005, at 44:3 - 45:6. Defendants presented

evidence that the presence of those economic substitutes (including metered billing, chip phones,

hot-lining and network-based solutions) made it impossible for Boston Communications and the

---

[2] *See* Trial testimony of Russell Parr, March 30, 2005, at 101:4-102:13; *see also* Trial Exhibit Nos. 259, 485, 3927, 4037.

[3] *See id.* at 102:14 - 103:5; *see also* Trial testimony of Russell Parr, March 29 2005, at 4:23-6:2; Trial Exhibit No. 3912.

[4] *See id.* at 103:8-19; *see also* Trial Exhibit 1633.

wireless carriers to absorb a royalty of that magnitude. *See* Trial testimony of Jerry Hausman, Ph.D., May 2, 2005, at 67:19 - 68:14, 84:1 - 85:10, and 86:23 - 88:20.

Fourth, in calculating the reasonable royalty from profit margin differential and cost savings approaches, Mr. Parr improperly compared the profitability of prepaid using the allegedly infringing system with the profitability of postpaid.[5] *See* Trial testimony of Russell Parr, March 30, 2005, at 9:4 -10:7. Instead, Mr. Parr should have considered the profitability of prepaid using the allegedly infringing system with the profitability of prepaid using economic substitutes. *See Georgia-Pacific Corp.*, 318 F.Supp. at 1120 (Factor No. 9: "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.").

Fifth, Freedom considered the wireless carriers' revenues in place of Boston Communications' revenues as the basis for the reasonable royalty. Yet Mr. Parr agreed that the analysis of the reasonable royalty must comport with the relationship of the parties. *See* Trial testimony of Russell Parr, March 29, 2005, at 123:4 - 124:12. *See also Georgia-Pacific Corp.*, 318 F.Supp. at 1120. The evidence at trial confirmed that Boston Communications was a vendor providing a service to the carriers, and, as such, Boston Communications would secure the right to use the Boston Communications' service bureau for its carrier customers. *See also* Trial testimony of Frank Boyer, April 25, 2005, at 29:4 - 31:5; Trial testimony of E.Y. Snowden, April 25, 2005, at 113:20 - 114:12; Trial testimony of Jerry Hausman, May 5, 2005, at 5:16 - 6:9.

Sixth, Mr. Parr's and Mr. Harris' testimony was riddled with basic mathematical errors, making it impossible to reconcile Freedom's claimed royalty with their own calculations, or the

---

[5] Moreover, Freedom did not present credible evidence that prepaid was more profitable than postpaid to justify Mr. Parr's use of the profit differential and cost savings approaches.

- 5 -

actual data presented at trial. For example, Mr. Harris did not include Freedom's claimed royalty in his lifetime subscriber profitability model. Mr. Parr also made an elementary mathematics error in computing the average revenue per minute for the carrier Defendants' services, using an improper "average of averages" to arrive at a 48 cent per minute figure when the total revenues divided by total minutes shows an average of 27 cents. *See* Trial testimony of Russell Parr, March 30, 2005, at 85:19-25. Mr. Parr compounded his error by using the 48 cent figure as the basis for his royalty computations. *See id.* at 6:18 - 9:20.

Seventh, even without correcting for this error, Mr. Parr's own calculations do not support Freedom's claimed royalties. For example, his "Rule of Thumb" calculation only comes to a range of 2.4 cents to 3.1 cents per minute. *See id.* at 6:18 - 7:25. By rounding up those figures to five cents, Mr. Parr overstates the damages claim in this case by over $100 million.

Finally, the amount of Freedom's claimed royalty is excessive and speculative (and not reasonable, as the law requires). It is undisputed that the claimed royalty is over twice the amount of Boston Communications' revenues of $122 million from its allegedly infringing service bureau and over ten times the amount of Boston Communications' profits of $24 million. It also is equal to or greater than the defendant carriers' profits from providing prepaid wireless to end users.[6] Yet Freedom has provided no evidence that those revenues or profits are attributable to the patented invention as opposed to the defendants' networks, infrastructure, and advertising, in addition to other services defendants provide to the end users, such as customer care, roaming and long-distance.

---

[6] Freedom's damages expert, Richard Harris, estimated that the wireless carriers could earn a prepaid profitability margin of 19.68% if they achieved certain subscriber variables. *See* Trial testimony of Richard Harris, March 23, 2005, at 8:6-9, 46:20 - 47:6. Applied to the defendant carriers' revenues, this results in a profitability estimate of $280 million. However, Mr. Harris admitted at trial that Western Wireless lost money from offering prepaid wireless, *see id.*, and the profit margins of Cingular and its predecessor were lower than Mr. Harris' estimate. *See* Trial testimony of James Glass, April 22, 2005, at 114:18-23.

## B.     NO REASONABLE JURY COULD AWARD DAMAGES IN EXCESS OF BOSTON COMMUNICATIONS' PROFIT OF $24 MILLION

As discussed above, defendants presented evidence and expert testimony that in the telecommunications industry, vendors such as Boston Communications would secure the right to use their services for their carrier customers. Accordingly, Boston Communications would have paid for a license that covered its and its customers' use of the claimed invention. Plaintiff presented no evidence to the contrary. Moreover, it is axiomatic that the reasonable royalty must permit the licensee to make a reasonable profit. *See Georgia-Pacific Corp.*, 318 F.Supp. at 1120. Thus, no reasonable jury could award damages in excess of Boston Communications' profit from the allegedly infringing service bureau, or $24 million ($0.46 cents per minute).

## III.    Conclusion

For the foregoing reasons, the Court should grant Defendants' motion for judgment as a matter of law:

(1) that Freedom's claimed royalty of 5 cents/minute is excessive and not supported by evidence presented at trial; and

(2) that no damages awarded can exceed Boston Communications' total profit from processing minutes on its prepaid wireless service bureau for the defendant carriers, namely $24 million ($0.46 cents per minute).

May 9, 2005

Respectfully submitted,

DEFENDANTS BOSTON COMMUNICATIONS INC.,
By their attorneys,

Phil Swain | SLS

Michael B. Keating (BBO # 263360)
Philip C. Swain (BBO # 544632)
FOLEY HOAG LLP

B3032037.2                                      - 7 -

155 Seaport Boulevard
Boston, MA 02110
(617) 832-1000

DEFENDANT WESTERN WIRELESS
CORPORATION,
By its attorney,

Vickie L Henry

Vickie L. Henry (BBO # 632307)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02110
(617) 832-1000

DEFENDANTS AT&T WIRELESS SERVICES,
CMT PARTNERS, AND CINGULAR WIRELESS
LLC

By their attorneys,

Maia H. Harris (BBO # 648208)
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110-1832
Telephone: (617) 345-1000
Facsimile: (617) 345-1300

Denis R. Salmon (pro hac vice)
Gibson Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

Monique Drake (pro hac vice)
Gibson Dunn & Crutcher LLP
1801 California Street, Suite 4200
Denver, CO 80202
(303) 298-5700

James Snell (pro hac vice)
Bingham McCutchen LLP
1900 University Avenue
E. Palo Alto, CA  94303
Telephone: (650) 849-4400
Facsimile: (650) 849-4730

## Certificate of Service

I certify that I have caused the attached document to be served by hand on counsel for all
parties on May 9, 2005.

Vickie L. Henry